Patricia A. ZUCHOWICZ

v.

UNITED STATES of America.

Civ. No. 2:91CV1033 (PCD).

United States District Court,
D. Connecticut.

Sept. 15, 1994.

Robert I. Reardon, Jr., Daniel J. Horgan, Reardon & Nazzaro, P.C., Angelo A. Ziotas, New London, CT, Lori Welch–Rubin, Welch–Rubin & Welch–Rubin, North Haven, CT, for plaintiff.

Carl J. Schuman, U.S. Attorney's Office, Hartford, CT, Mary Jo Donahue, U.S. Dept. of Justice, Torts Branch, Civ. Div., Washington, DC, for defendant.

DORSEY, Chief Judge.

### RULING ON PENDING MOTIONS

Plaintiff brings this action for wrongful death under the Federal Tort Claims Act, 28 U.S.C. § 2674 *et seq.* Defendant moves to exclude plaintiff's experts' testimony on causation, asserting that it is mere conjecture, and inadmissible under Federal Rules of Evidence 104, 403, 702 and 703. Defendant also moves for summary judgment, contending that plaintiff is unable to prove causation and therefore Connecticut law requires dismissal of plaintiff's claims.

## I. BACKGROUND

Plaintiff sought medical treatment at the Naval Hospital in Groton, Connecticut. Dr. Robert C. Myers, Captain, United States Navy Medical Corps, performed exploratory surgery, diagnosed her as having endometriosis, and prescribed Danocrine. Plaintiff alleges that the prescription was erroneously marked so that she ingested twice the maximum recommended dosage of Danocrine from approximately February 21, 1989 through March 24, 1989 and that she ingested all two hundred and forty tablets provided. Plaintiff asserts that she followed the instructions printed on the prescription bottle label: "TAKE 2 CAPSULES BY MOUTH TWICE DAILY THEN INCREASE TO TAKE 4 CAPSULES BY MOUTH TWICE A DAY IF STILL BLEEDING." Because each tablet contained 200 milligrams of Danocrine by weight, she was instructed to take 800 milligrams of Danocrine per day and to increase her intake to 1600 milligrams per day if her bleeding persisted.

Dr. Myers, who wrote the prescription, testified that he intended to prescribe 400 milligrams daily, to be increased to 800 milligrams daily, rather than 800 milligrams increased to 1600 milligrams.

Plaintiff alleges that as a result of excessive amounts of Danocrine, she experienced a racing heart, shortness of breadth, fatigue, severe headaches, dark colored urine with extremely strong odor, chest pains, left lower quadrant pain, and severe edema and weight gain. She asserts that she complained to Dr. Myers on or about March 6, 1989 of these symptoms and that he instructed her to continue taking the Danocrine dosage listed on the bottle.

On or about March 24, 1989, Dr. Myers again examined plaintiff, and renewed her prescription for Danocrine. This new prescription instructed her to take 800 milligrams per day and authorized a prescription refill twice thereafter. Plaintiff asserts that she continued to take Danocrine until May 30, 1989, when a private physician examined her and instructed her to immediately cease taking Danocrine.

Plaintiff alleges that diagnostic tests revealed enlargement of the right ventricle of her heart, and that doctors diagnosed her as suffering from a terminal illness known as pulmonary hypertension, for which there is no known cure. Plaintiff was treated for pulmonary hypertension from October 1989 through December 1991. She died on December 31, 1991.

## II. DISCUSSION

### A. Motion in Limine

■ The Federal Rules of Evidence supersede the *Frye* "general acceptance" test in determining the admissibility of expert scientific testimony.[1] *Daubert v. United States*, —— U.S. ——, —— ——, 113 S.Ct. 2786, 2793–94, 125 L.Ed.2d 469. The *Daubert* Court stated that *Frye*'s "general acceptance" test was an "austere standard" and that "such a rigid general acceptance requirement would be at odds with the liberal thrust of the Federal Rules and their 'general approach of relaxing the traditional barriers to opinion testimony.'" *Id.* at ——, 113 S.Ct. at 2793 (quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169, 109 S.Ct. 439, 450, 102 L.Ed.2d 445 (1988)). The Federal Rules of Evidence require that expert testimony be relevant to the issues and rest on a reliable foundation. *Id.*

### 1. Federal Rules of Evidence 702 and 104

Rule 702 specifically governs expert testimony, providing:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702. Expert testimony thus must rest on a reliable foundation by pertaining to "scientific ... knowledge." *Daubert,*

---

1. In *Frye v. United States*, 293 F. 1013 (D.C.Cir. 1923), the Court of Appeals for the District of Columbia stated that expert opinion based on a scientific technique is admissible if the scientific technique is "generally accepted" as reliable in the relevant scientific community.

— U.S. at ——, 113 S.Ct. at 2794. The term, scientific, "implies a grounding in the methods and procedures of science" and knowledge "connotes more than subjective belief or unsupported speculation." *Id.* Faced with a proffer of expert scientific testimony, it is necessary, pursuant to Rules 104(a)[2] and 702, to review the qualifications of Plaintiff's experts Dr. Matthay, Dr. Tackett, and Dr. Meyers to determine if their testimony 1) is scientific knowledge that 2) will assist the trier of fact to understand or determine a fact in issue. *Id.* at ——, 113 S.Ct. at 2796. The standard of review is a "preponderance of proof." *Id.* at —— n. 10, 113 S.Ct. at 2796 n. 10.

### 2. *Qualifications as an Expert*

*Richard Matthay, M.D.*

■ Richard Matthay, M.D. is a Professor and Associate Chairman of the Department of Medicine at Yale University School of Medicine. In addition, he is the Associate Director of the Pulmonary and Critical Care Section, the Training director for the Pulmonary and Critical Care Section, and the Associate Director of the Winchester Chest Clinic at Yale–New Haven Hospital. Defendant's expert pulmonologist, Dr. Lewis Rubin, acknowledged that Dr. Matthay is an expert in pulmonary hypertension. He has published over 300 articles in scientific journals on pulmonary hypertension. He clearly possesses expert scientific knowledge in this field.

*Randall Tackett, Ph.D.*

■ Randall Tackett, Ph.D. is an Associate Professor and Chair of the Department of Pharmacology and Toxicology at the University of Georgia. Dr. Tackett's research focus has been on vasoactive agents and their effect on the vascular system. Dr. Tackett does not hold an M.D. degree, yet he is an academic pharmacologist experienced and trained in pharmacology, probably to a degree greater than most doctors. He has

published numerous articles in scientific journals. He clearly possesses expert scientific knowledge of pharmacology.

*Frederick Meyers, M.D.*

■ Frederick Meyers, M.D. is Professor Emeritus and former Chairman of the Department of Pharmacology at the University of California, San Francisco. His many years of research, teaching, and clinical care establish his expertise in pharmacology.

### 3. *Scientific Validity of Testimony Rules 702, 703, and 403*

■ Rule 702 requires a determination of whether testimony's underlying reasoning or methodology is scientifically valid and properly can be applied to the facts in issue. *Daubert,* —— U.S. at —— – ——, 113 S.Ct. at 2795–96. Considerations which bear on the inquiry include whether the theory or technique in question can be (and has been) tested, whether it has been subjected to peer review and publication, its known or potential error rate, the existence and maintenance of standards controlling its operation, and to some extent, whether it has attracted acceptance within a relevant scientific community. *Id.* at ——, 113 S.Ct. at 2795. There is no definitive checklist of factors; the inquiry is a flexible one, focusing on principles and methodology, not on the conclusion generated. *Id.* at ——, 113 S.Ct. at 2797.

"[A]lthough *Daubert* involved Rule 702, the flexibility of the federal rules also applies to Rule 703 and the determination of the trustworthiness of the sources of expert testimony." *United States v. Locascio,* 6 F.3d 924, 938 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994).

■ Rule 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the

---

**2.** Rule 104(a) provides:
Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b)

[pertaining to conditional admissions]. In making its determination it is not bound by the rules of evidence except those with respect to privileges.
Fed.R. of Evid. 104(a).

hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Fed.R.Evid. 703. Under Rule 703, a district court has broad discretion to determine whether an expert acted reasonably in making assumptions of fact upon which he or she bases his testimony. *Locascio* 6 F.3d at 939 (quoting *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir.1984)). While a court carefully examines scientific theories based upon epidemiological, clinical, and animal studies, *In re "Agent Orange" Product Liability Lit.*, 611 F.Supp. 1223, 1244 (E.D.N.Y.1985), judges may not always have the "special competence" to resolve complex issues which stand "at the frontier of current medical and epidemiological inquiry." *Ferebee v. Chevron Chemical Co.*, 736 F.2d 1529, 1534 (D.C.Cir.1984). As the *Daubert* Court stated:

> An expert is permitted wide latitude to offer opinions, including those that are not based on first-hand knowledge or observation ... this relaxation of the usual requirement of first-hand knowledge ... is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.

*Daubert*, —— U.S. at ——–——, 113 S.Ct. at 2795–96.

■ Rule 403 also speaks to a "gatekeeping" role in admitting testimony. It requires expert testimony to be trustworthy and not more prejudicial than probative. It provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed.R.Evid. 403.

### a. Scientific Validity of Dr. Randall Tackett's Testimony

*Rule 702*

■ Dr. Tackett asserts that Danocrine more probably than not caused plaintiff's death from pulmonary hypertension. Drawing upon his extensive education and training in pharmacology, Dr. Tackett's scientific technique relied upon epidemiological, clinical, and animal studies, as well as plaintiff's medical records and medical history in his opinion that Danocrine caused plaintiff's terminal illness. His testimony is based upon medical studies which have been subjected to peer review and publication, and his testimony is based upon data and methodologies reasonably relied upon by experts in his field. He uses a scientific technique which has been accepted by many courts and which has gained general acceptance within the relevant scientific community. *In re "Agent Orange" Product Liability*, 611 F.Supp. at 1243. His testimony satisfies admissibility standards set by Federal Rules of Evidence 702 and 104 and thus his testimony is admissible since it will assist the trier of fact in determining causation.

### Rules 703 and 403

■ Defendant argues that plaintiff's experts' opinions, including Dr. Tackett's, are inadmissible under Rules 703 and 403 because they are not based on facts or data "reasonably relied upon by experts in [their] particular field." Fed.Evid.Rule 703. Defendant offers three reasons why Dr. Tackett's testimony lacks a proper foundation. First, Dr. Tackett has never published on the topic of Danocrine or any other steroid. Second, Dr. Tackett partly bases his causation opinion on the temporal relationship between plaintiff's ingestion of Danocrine and her death, which federal courts do not accept, alone, as sufficient explanation to prove causation. Third, Dr. Tackett only cites scientific authority showing that Danocrine causes hyperinsulinemia, but does not cite any authority supporting his theory that Danocrine-induced hyperinsulinemia causes pulmonary hypertension.

Defendant, however, has not exhaustively characterized Dr. Tackett's testimony. Contrary to Defendant's assertions, Dr. Tackett has conducted experimental studies with steroids. While he has not published these studies, his training and research in pharma-

cology allows a finding that he possesses expert scientific knowledge of steroids. Also, Dr. Tackett does not wholly base his testimony on the temporal relationship between Plaintiff's ingestion of Danocrine and her death. He bases his testimony on various animal and epidemiological studies concerning Danocrine, hyperinsulinemia, and pulmonary hypertension. Dr. Matthay, a pulmonologist, testified that he found Dr. Tackett's theory to be a very plausible explanation of how Danocrine caused Plaintiff's pulmonary hypertension. That a distinguished pulmonologist found Dr. Tackett's methodology to rest upon a solid scientific foundation further supports admitting Dr. Tackett's testimony.

In response to Defendant's arguments that Dr. Tackett cannot assert his conclusions to a standard of certainty, it is appropriate to quote *Daubert,* which opined:

> Of course, it would be unreasonable to conclude that the subject of scientific testimony must be "known" to a certainty; arguably, there are no certainties in science. . . . "Indeed, scientists do not assert that they know what is immutably 'true'— they are committed to searching for new, temporary theories to explain, as best they can, phenomena."

*Daubert* —— U.S. at ——, 113 S.Ct. at 2794 (quoting Brief for Nicolas Bloombergen et al. as Amici Curiae 9).

### b. *Scientific Validity of the Testimony of Dr. Matthay and Dr. Meyers Rules 104, 702, 703, and 403*

Dr. Matthay and Dr. Meyers similarly base their testimony upon a careful review of medical literature concerning Danocrine and pulmonary hypertension, and plaintiff's medical records and medical history. Like Dr. Tackett, their testimony is founded upon data and methodologies that are reasonably relied upon by experts in their field and generally accepted in the scientific community. Their testimony is also admissible since it too satisfies the admissibility requirements of Federal Rules of Evidence 702, 703 and 403. Defendant's attacks on plaintiff's experts' testimony are more properly directed to the weight of their opinions, rather than to their admissibility.

In addition, Dr. Matthay is the only expert who personally discussed her symptoms and medical history with plaintiff before she died. His testimony concerning these discussions may be especially valuable to the trier of fact and will be admitted. *O'Gee v. Dobbs Houses, Inc.,* 570 F.2d 1084 (2d Cir.1978). Accordingly, the motion in limine is denied.

### B. *Summary Judgment*

Summary judgment will be granted only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The initial burden is on the moving party to demonstrate that there are no material issues of fact in dispute. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2nd Cir.1990). "All reasonable inferences and any ambiguities are drawn in favor of the non-moving party." *Id.*

Summary judgment is particularly appropriate in cases where the parties disagree only on the application of law to stipulated facts. When the parties disagree as to certain facts, as here, summary judgment can be granted only upon a determination that the factual disputes are not genuine, or that the disputed facts are not material. A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.*

The non-moving party facing a summary judgment motion may not rest upon the mere allegations or denials of its pleading, but its response, by affidavits or as otherwise provided in Rule 56, "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Rule 56 mandates entry of summary judgment, after adequate time for discovery and upon motion, against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477

U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

 While Plaintiff's experts' testimony is admissible under the Federal Rules of Evidence, it is still possible that such evidence is not sufficient to withstand Defendant's motion for summary judgment. Plaintiff still may be unable to prove causation under Connecticut tort law. Connecticut law applies to this action since under the Federal Torts Claims Act 28 U.S.C. § 1346(b), the United States is liable to the extent that "a private person would be held liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). The acts or omissions alleged occurred in Connecticut, and thus Connecticut law applies.

Under Connecticut law, a plaintiff alleging medical malpractice must prove: "(1) the requisite standard of care for treatment, (2) a deviation from the standard of care, and (3) a causal connection between the deviation and the claimed injury." *Hammer v. Mount Sinai Hospital*, 25 Conn.App. 702, 717, 596 A.2d 1318 (1991). "Expert opinion is necessary to establish causation in a malpractice action and that opinion must rest upon more than mere surmise or conjecture." *Shelnitz v. Greenberg*, 200 Conn. 58, 66, 509 A.2d 1023 (1986). Causation may be established "by the direct opinion of a physician, by his deduction by the process of eliminating causes other than the traumatic agency, or by his opinion based upon a hypothetical question." *Id.* "A doctor may give an opinion on a medical issue without having examined or treated the patient." *Id.* 509 A.2d at 1028. It is a matter of judicial discretion as to whether a witness has demonstrated sufficient experience and opportunity of observation to render his opinion. *Hammer*, 25 Conn.App. at 718, 596 A.2d 1318.

Plaintiff's experts have been shown to possess the requisite scientific expertise and experience to qualify under Connecticut law to provide expert testimony in this suit. Their testimony is based on well-founded scientific methodologies. They have testified that proximate cause exists because there is a temporal relationship between the overdose and the onset of the disease. Defendant disputes these conclusions, relying on the reasoning of its experts and various studies. As the testimony on record creates a genuine issue of material fact on the issue of causation, summary judgment is inappropriate.

### III. *CONCLUSION*

Defendant's motion in limine and for summary judgment (doc. # 110) is DENIED.

SO ORDERED.