[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is a negligence action brought by the Plaintiff Elvy Levy against the State of Connecticut and the Connecticut State Department of Corrections. The plaintiff alleges that she slipped and fell at the gate house at the Connecticut Correctional Institution. The defendants plead in special defense that 1) the plaintiff was guilty of contributory negligence; and 2) that authorization to sue is limited to $25,000.00 pursuant to C.G.S. § 4-160 and the Doctrine of Sovereign Immunity.
The facts are as follows. The plaintiff Elvy Levy went to the Connecticut Correctional Institution in Somers on September 3, 1992, to attend a deportation hearing being held for her son, Mark. The plaintiff was accompanied by four of her children, Marcia Levy-Shelby, Sonia Levy-Reid, Maxine Levy and Anthony Watson. The plaintiff and her children arrived at the correctional facility in the morning. Entrance to the facility was through the gate house where visitors were checked, identified, and cleared before entering the prison. At noon the hearing was recessed for lunch. The plaintiff and her children went back to the gate house to leave the prison and go to lunch. While crossing the gate house the plaintiff slipped on water that had been tracked in by people leaving and entering the gate house.
The incident was brought to the attention of the Corrections Officer at the gatehouse desk., Officer Locario, who called in a correctional medical attendant, Bryant Sherman. When Sherman arrived the plaintiff was sitting on the bench in the gate house holding her right hip. The plaintiff told Sherman she had fallen and complained of right hip pain. Sherman found no obvious sign of trauma and no redness. Sherman found plaintiff's clothing to be dry. Plaintiff did not say anything to Sherman about her right knee. Plaintiff displayed her right hip to him. He found her stocking was not wet and was intact.
Following her examination by Sherman the plaintiff and her children left the prison and went to lunch. Plaintiff felt no discomfort at that point. After lunch plaintiff and her children CT Page 1301 re-entered the gate house and attended the afternoon proceedings. The following day the plaintiff went to Mount Sinai Hospital Emergency Room complaining about a painful right leg and of back pain. The history she gave the hospital was that she had slipped and fallen on her back and knees; that, the fall had taken place on September 3, 1992 at the State Correctional Institution on a wet floor.
The year before in July, 1991, the plaintiff was in a car accident and injured her neck and back. At the time she treated with Dr. Powers. She also treated with Dr. Butkowsky who subsequently discharged her with a disability of the neck and back. Her treatment with Dr. Butkowsky after the September 3, 1992 fall was to her neck and back. Dr. Butkowsky's records between September 9, 1992 through April 15, 1993 reflect treatment to the neck and back but no treatment for the knee.
On December 3, 1993 the plaintiff saw Dr. Thomas Stevens for her right knee. The plaintiff had been under the care of Dr. Stevens at an earlier time for problems with her left knee which culminated in surgery to the left knee performed by Dr. Stevens in 1989. At the time the plaintiff was found to have degenerative arthritis. The plaintiff was under the care of Dr. Stevens until April 18, 1994. During the intervening months Dr. Stevens' work up on the plaintiff revealed what appeared to be synovitis with mild osteoarthritis. Dr. Stevens found the plaintiff did not respond to treatment, the pain persisting, and that the work up demonstrated a tear of the posterior horn of the medial meniscus by MRI, which according to the interpretation was probably degenerative in nature. Dr. Stevens also found degenerative changes present in the articular cartilage and tibial joint, a Baker's cyst and severe tibia vara. Dr. Stevens scheduled her for arthroscopic intervention.
In his April 18, 1994 letter to plaintiff's attorney, Dr. Stevens, in addition to providing the information referred to in the previous paragraph, went on to point out that he had reviewed the Emergency report dated 9/4/92 which he stated apparently was a consequence of an injury when she slipped on a wet floor. Dr. Stevens goes on to state in this letter that, while it was possible that the two may be related, it is not highly probable that the visitation to his office a year after the fact was a consequence of the fall. Dr. Stevens goes on to point out that the plaintiff has significant degenerative changes present in the knee and that these were of more than one year in duration. Dr. CT Page 1302 Stevens states that the injury that plaintiff had in September of 1992 may have affected it somewhat, but that the fall was not the precipitating cause for her difficulties currently.
On April 26, 1994, within one week of Dr. Stevens' letter to plaintiff's attorney, the plaintiff saw Dr. Paul Murray. The plaintiff did not reveal in the history she gave Dr. Murray that she had been under the care of Dr. Stevens. She did not reveal the fact of the 1989 surgery on her left knee, nor did she reveal that Dr. Stevens had, within the same month that she saw Dr. Murray, advised her she needed arthroscopic intervention. Dr. Murray was only told about the physical therapy she had needed after the September 3, 1992 fall and her complaints about her right knee.
Dr. Murray determined the treatment of choice for the plaintiff to be an arthroscopy and partial medial menisectomy. A right knee arthroscopy and partial synovectomy took place on May 17, 1994. Before the surgery Dr. Murray had thought there was cartilage tear. However, when he went into the knee he found no tear of the cartilage but did find the plaintiff had an inflamation of the lining.
Dr. Murray in his letter to plaintiff's attorney dated September 2, 1994 stated he felt the injury to plaintiff's right knee was initialed on September 3, 1992 when she fell at the Somer's prison. In this letter of September 2, 1994, Dr. Murray writes:
 "The patient was seen by Dr. Tom Stevens at Mr. Sinai Hospital. Dr. Stevens ordered an MRI and found medial meniscal tear involving the posterior horn of the medial meniscus. Dr. Stevens scheduled the patient for surgery. The patient now presents here for a second opinion and treatment regarding her right knee."
In fact, Dr. Murray did not know of Dr. Stevens' involvement with the plaintiff until one week before the instant trial when he was given partial records of Dr. Stevens by plaintiff's attorney. When asked during the trial whether the condition of the plaintiff's right knee was the same as the left Dr. Murray found the condition to be the same as in the left knee.
Dr. Myron Shafer, an orthopedic surgeon, reviewed the medical file on the plaintiff made available to him by the defendant's CT Page 1303 attorney. That file referenced the 9/3/92 fall at the Correctional Institution at Somers; it contained the Mt. Sinai Hospital Emergency Room report as well as the medical records of Dr. Butkowsky, Dr. Thomas Stevens, and Dr. Murray. Dr. Shafer notes that the plaintiff is 61 years old, that she works at St. Mary's Hospital in food service delivery and therefore would be on her feet. He also notes that when she first saw Dr. Murray she was a little bow-legged and that her problem was on the medial side of the knee, which he states would not be unusual since this would be a stress point. Dr. Shafer stated he did not feel that the problem she had with her knee, when she saw Dr. Murray was related to the fall in September of 1992. He stated the plaintiff in her late 50's had degenerative changes in the knee already and he did not feel the degenerative changes would have occurred just from a fall. Dr. Shafer also found it significant that after the fall her treatment was strictly to her spine with the chiropractor, and that actually this was the same area that she was treated for by Dr. Powers for a previous auto accident.
Dr. Murray's post-operative examination on May 24, 1994 found the incision healing nicely and that overall the plaintiff was doing well. He found motion excellent and minimal swelling. Plaintiff went back to Dr. Murray on June 21, 1994 having pain in the right knee. Though he found range of motion to be excellent, good stability and the knee nicely on track, because of her pain complaints he injected her with cortisone. Again on October 7, 1994 plaintiff saw Dr. Murray with continuing pain in her right knee. Again she received a cortisone injection. The plaintiff saw Dr. Murray again on March 8, 1995 complaining about constant pain in her right knee. X-rays showed mild degenerative changes. Again plaintiff was injected with cortisone.
In his report to plaintiff's attorney dated March 30, 1995 Dr. Murray, based on plaintiff's subjective complaints gave her a7-1/2 percent permanent partial disability of the right knee. This he attributed to the September 3, 1992 fall.
On August 7, 1996 the plaintiff again returned to Dr. Murray complaining of right knee pain which radiated down to the right region. Over the last year the plaintiff advised Dr. Murray that she had increased pain. According to Dr. Murray the pain was with all ambulation. She had some locking and grinding and moderate swelling. The inner joint face showed significant degeneration. At this time Dr. Murray did not think the right knee was symptomatic enough to warrant knee replacement. On July 14, 1997 CT Page 1304 the plaintiff was seen again by Dr. Murray with the right knee pain. X-rays showed severe degenerative arthritis and obliteration of the right knee. Again, on November 13, 1997 Dr. Murray continued to find severe degenerative arthritis with tenderness, range limitations and grinding.
On November 3, 1998, the plaintiff presented herself to Dr. Murray with left knee complaints as well. Dr. Murray's examination of the left knee disclosed she had the same condition in her left knee that she had in her right knee. Dr. Murray did not learn of plaintiff's earlier involvement with Dr. Stevens both as to the left knee surgery or right knee diagnosis until one week before the instant trial. This part of plaintiff's medical history was never revealed to him over the four years that he treated her.
The floor of the gate house is natural stone flagging set with mortar joints. There are mats at the entrance to and exit from the gate house. The lighting is fluorescent. Lighting is good. On the day of the incident it was raining. Because of the high shine of the gate house floor it becomes slippery when wet. On the day of the incident, several people slipped and almost fell down. A notation to that effect and that the floor in the gate house was slippery when wet was made in the incident report, made out documenting plaintiff's incident on September 3, 1992. The incident report writer, John Locario, who at the time was the arsenal officer assigned to the arsenal located in the gate house, himself had almost slipped on that floor that day. Locario had knowledge prior to the plaintiff's September 3, 1992 fall that the gate house floor was slippery when wet. It was undisputed by either the plaintiff's or defendants' expert that this type of floor sealed, waxed and buffed would be more dangerous with water on it. One would not know this until stepping on it.
The plaintiff has claimed the plaintiff was either a business invitee or a licensee, that because of the nature of the defect the defendant had a responsibility to warn of the condition. Though initially the plaintiff had claimed in her pleadings to be an invitee she amended her complaint and also made a claim as licensee arguing that even as a licensee as claimed by the defendant, the duty owed a licensee by a possessor of land had been breached because the possessor of land must warn licensees of dangerous hidden hazards actually known to the possessor of land. CT Page 1305
Since this court concludes that the gate house floor poses a dangerous hidden hazard when wet and that this was known before the September 3, 1992 fall to at least one correctional officer who was assigned to that location, the defendant failed in its duty to warn the plaintiff even under the standard of care applicable to licensees. We therefore need not determine whether the plaintiff was a business invitee or a licensee since the standard of care applicable to a business invitee is higher than that due a licensee.
The defendant has pled in special defense that the plaintiff was contributorily negligent. This court finds no contributory negligence on the part of the plaintiff.
We are persuaded that the plaintiff slipped on the gate house floor. However, in view of the fact that the only treatment in the seven months following this incident was for back and neck complaints, we conclude the parts of her body affected by the fall were her neck and back. The plaintiff did not seek any treatment for the right knee until over one year later on December 3, 1993 when she returned to Dr. Stevens who had treated her for a degenerative arthritis condition of her left knee. Dr. Stevens found the same condition in her right knee that he had treated her for in her left knee. Dr. Stevens did not connect the right knee condition to the September 3, 1992 fall.
The fact that the plaintiff returned to Dr. Butkowsky shortly after the September 3, 1992 incident and remained under his care for several months for neck and back is indicative of some aggravation to the areas hurt in the 1991 car accident, that is her neck and back. Dr. Butkowsky's bill for care rendered between February 9, 1992 through April 15, 1993 is $2,497.00. The permanent partial rating given the plaintiff by Dr. Powers as a result of the 1991 auto accident, i.e. 5% cervical 5% low back, did not change as a result of the September 3, 1992 incident.
The plaintiff is 63 years old. She was 57 years old on September 3, 1992. At the time she worked at St. Mary's Home, where her job duties were serving food to the residents. This involved pushing a cart and being on her feet. She worked eight hours each day. She has worked for 30 years and continues to work. Because of her arthritic condition as well as a residual injuries from the 1991 auto accident her work is increasingly harder for her. However, there is no wage claim for the period CT Page 1306 following the 9/3/92 fall nor is there any evidence that Dr. Butkowsky placed any limitations on her ability to continue to perform her job duties.
The plaintiff must prove by a preponderance of the evidence that the injuries for which she is making claim were caused by the fall she suffered in the gate house of the Connecticut Correctional Institution at Somers. Though the complaint alleges a whole spectrum of claims the evidence presented by the plaintiff focused on the physical therapy to the neck and back provided by Dr. Butkowsky for the period from September 9, 1992 through April 15, 1993, and treatment for the right knee some sixteen months later.
The doctor most familiar with plaintiff's medical history regarding the degenerative arthritis condition which has afflicted the plaintiff's knees over the years preceding the September 3, 1992 incident is Dr. Robert Stevens. It is only when Dr. Stevens opines to plaintiff's attorney that he does not attribute to the September 3, 1992 fall the problems plaintiff is having with her right knee that the plaintiff drops him and immediately goes to another doctor to whom she does not reveal her medical history with Dr. Stevens.
And independent opinion by Dr. Myron Shafer based on a full examination of all her medical records including those of Dr. Butkowsky, Dr. Stevens and Dr. Murray arrives at the same conclusion as that of Dr. Stevens.
The plaintiff has objected to the use of Dr. Shafer's deposition on the grounds that Dr. Shafer did not do a physical examination of the plaintiff and is basing his opinion on a record examination only. The plaintiff has not provided this court with any authority for this position. The defendant in support of its offer of Dr. Shafer's deposition and report cites the case of Shelvitz v. Greenberg, 200 Conn. 58 (1986), which states, "a doctor may give an opinion on a medical issue without having examined or treated the patient." at 67. The plaintiff's objection is overruled.
Dr. Murray without benefit of the plaintiff's full medical history preceding the September 3, 1992 fall, with only the information of the September 3, 1992 fall, opines a causal connection. CT Page 1307
Dr. Murray does not question why the information about Dr. Stevens care was not made available to him until one week before the trial, nor does it appear he gave any weight to the fact that both the right and left knees had the same degenerative arthritic condition.
The court finds that the plaintiff has not carried her burden of proof of establishing by a preponderance of the evidence that the September 3, 1992 fall was the proximate cause of the medical problems the plaintiff has been having with her right knee. Nor is there evidence to support an aggravation claim since the plaintiff did not seek any medical care for her right knee until some sixteen months after the September 3, 1992 fall .
Having concluded that the right knee problems were not caused by the September 3, 1992 incident, we give no consideration to the permanency rating given by Dr. Murray. There is no claim for lost wages during the time that the plaintiff was receiving therapy for her neck and back between September 9, 1992 and April 15, 1993. She continues to work.
Plaintiff has been told that in time she may have to consider knee replacement surgery for both knees because both knees show the presence of significant degenerative arthritis. Plaintiff had this condition before the accident and it has gotten worse over time. None of this is attributable to the September 3, 1992 fall.
Medical bills attributed to the September 3, 1992 fall include the bill for $96.46 from Mount Sinai Hospital for emergency room services rendered on September 4, 1992; and, the bill for $2,497.00 from Dr. Butkowsky for physical therapy provided between September 8, 1992 and April 15, 1993. Since all subsequent medical bills incurred relate to problems with the right knee, beginning with seeing Dr. Stevens on December 3, 1993, these are not included in this court's damage award.
Non-economic damages found by the court include the trauma of the fall itself; the pain and suffering resulting from re-injury to the neck and back which required medical treatment over a period of months; the anxiety and concern about the injury. The court awards non-economic damages of $7,500.00.
Judgement may enter in favor of the plaintiff Elvy Levy in the amount of $2,593.46 economic damages and $7,500.00 non-economic damages for a total judgement of $10,093.46. CT Page 1308
Hennessey, J.