VIEJAS BAND OF KUMEYAAY INDIANS *v.* JAY
LORINSKY ET AL.
(AC 29512)

Beach, Robinson and Pellegrino, Js.

Argued March 9—officially released August 4, 2009

*Frank J. Liberty*, for the appellant (named defendant).

*Elizabeth J. Stewart*, with whom was *Michael C. Markowicz*, for the appellee (plaintiff).

*Opinion*

ROBINSON, J. The named defendant, Jay Lorinsky, appeals from the judgment of the trial court, rendered after a jury trial, in favor of the plaintiff, the Viejas Band of Kumeyaay Indians (Viejas).[1] On appeal, Lorinsky claims that (1) the court incorrectly concluded that the

---

[1] First Nations Financial Services, Inc. (First Nations), was also a defendant in this action but is not a party to this appeal. The appeal was dismissed as to it on April 2, 2008. We refer in this opinion to Lorinsky and First Nations collectively as the defendants and individually by name when appropriate.

accidental failure of suit statute, General Statutes § 52-592, permitted Viejas' case to be filed in state court, (2) the evidence was insufficient to support the jury's award of damages and (3) the court improperly denied the defendants' motions for a mistrial and to set aside the verdict. We disagree, and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. Lorinsky was an insurance broker and a representative of First Nations Financial Services, Inc. (First Nations). First Nations was at relevant times a corporation based in Norwich that sold insurance and brokerage services, and Lorinsky was one of its founders and the senior vice president.[2] Viejas, a federally recognized Indian tribe with more than 330 members, is located in Southern California. Viejas owns a casino, an outlet center and a community bank, among other holdings, and was First Nations' biggest client.

Lorinsky initially was retained by Viejas to procure life insurance coverage for members of the tribe as well as the employees of Viejas' businesses (Viejas employees) in approximately 1995. He later became involved in procuring health insurance for Viejas as well and was selected by the Viejas Tribal Council to be the broker of record on Viejas' health insurance plan in early 2001. As its insurance broker, Lorinsky arranged for life and health insurance[3] coverage for Viejas to be provided by The Hartford Life and Accident Insurance Company (The Hartford).[4] The insurance policies covered both actual tribal members and employees of the

---

[2] First Nations is no longer in existence.

[3] Viejas had both group life insurance and supplemental life insurance policies and both individual stop loss and aggregate stop loss health insurance policies.

[4] A third party administrator, Plan Handlers, Inc., processed the health care claims on Viejas' behalf. A third party administrator is a separate agency that processes the payments and ensures that the payments are consistent with the plan document.

tribe's casinos and other businesses under separate policies.

I

## THE LIFE INSURANCE POLICIES

The Hartford sent Lorinsky a letter dated March 28, 2001, informing him that the premiums on Viejas' group life insurance policies would increase effective May 1, 2001. The letter requested that Lorinsky notify Viejas about the new rates, as The Hartford would not be doing so directly. The bills generated by The Hartford for the payment of the life insurance policy premiums were directed to Lorinsky's attention and sent to his office, rather than going directly to Viejas.[5]

The life insurance policy bills were self-administered, meaning that each bill had to be completed by the client. The bills contained the applicable rate, and the client had to fill out the applicable number of employees and dependents during that policy period and multiply that number times the rate provided to calculate the premium amount for each period; the client was then expected to remit payment in that amount to The Hartford. Lorinsky was both the recipient of Viejas' bills from The Hartford and the person who completed them. Once the new rates took effect on May 1, 2001, Lorinsky began altering the bills to make it appear as if the older rates were still in effect before forwarding the invoices to Viejas, who paid The Hartford directly.

On August 16, 2001, Deborah Caul, an account analyst at The Hartford, sent Lorinsky a letter informing him that Viejas' life insurance account showed an underpayment in the amount of $10,480.20 for the months of May through August, 2001, resulting from the May 1,

---

[5] The fact that Lorinsky was the bill contact was unusual; The Hartford typically sends bills directly to the policyholder even when a broker is involved with the account.

2001 rate change.[6] This underpayment resulted from Lorinsky's alteration of the bills in an attempt to keep Viejas from paying the rate increase. Caul testified that it appeared that the older bills, containing the original lower rate, had been photocopied and the old dates whited out and new ones written in, making it appear that the lower rates were still in effect.[7] This happened every month from May, 2001, through January, 2002, where the name of the month and the rate was whited out and the new month was written in, making it appear that the lower rates that had been in effect in April, 2001, were still in effect. The premiums on the policy continued to be underpaid throughout that period.

There was concern about the continued underpayments among employees at The Hartford working on this account in September, 2001, and Caul was advised at that time that she might want to monitor Viejas' next bill to see if the proper amount was paid. There also was discussion in September, 2001, about sending the Viejas account to the collections department.

The Hartford repeatedly contacted Lorinsky about the continued underpayments, including by letter dated October 26, 2001, and Lorinsky was told that October 31, 2001, was the last day for him to contact The Hartford with the money for the rate change and to compensate for the underpayments. On October 31, Lorinsky

---

[6] Lorinsky testified that he did not notify Viejas of this letter because "I did not agree with it so I took it upon myself as their advisor and as their broker to go to The Hartford screaming, ranting and raving, telling them that you have to get rid of this nonsense and go back to what you told me and give us the original rates."

[7] Lorinsky testified that the plan had a renewal date of April 1, and when the April 1 bill arrived with the same rates as the prior year, because he believed that The Hartford did not follow procedure and give him thirty days notice prior to the renewal date of any rate increase, he felt that The Hartford was "on the hook for the year for the lower rates . . . . They had locked in those rates for another year as far as I was concerned."

claimed to Tom Rickis, one of Viejas' account managers at The Hartford, that he had been under the impression that if there were not a large amount of claims, there would be no rate increase, and he alleged that there had not been any claims for the past eighteen months so he did not understand how there would have been a rate increase. The Hartford denied that he was led to believe any of this.

The group life insurance policy was cancelled by The Hartford on November 1, 2001, effective October 1, 2001. In December, 2001, Lorinsky contacted The Hartford and indicated that Viejas wanted its policy to be reinstated and would pay the amounts due on the account. The Hartford determined that Viejas' underpayment of its account from May through November, 2001, totaled $19,168.05,[8] and after applying Viejas' December payment of $19,461.26 to the underpayment amount, a credit of $293.21 remained, which was applied to Viejas' December bill, leaving it owing a balance of $21,907.50 outstanding for the December premium.

On December 13, 2001, The Hartford sent a letter addressed to Anita Uqualla, tribal treasurer of Viejas, which indicated that it had concluded its review of Viejas' policy for the period May, 2001, through September, 2001, and determined that Viejas had underpaid its premiums in the amount of $13,579.75 for the group life insurance policy. The letter also indicated that The Hartford received payment from Viejas for the October, 2001 premium in the amount of $19,406.56, but because the policy had lapsed as of October 1, 2001, the payment could either be applied to the underpaid premium for the period of May through October, 2001, or be applied to October's receivables after the underpaid premium

---

[8] Viejas had underpaid by $2758.65 in May and June, 2001, and by $2794.15 in July through November, 2001.

was received. The Hartford again wrote to Uqualla on February 27, 2002, stating that the full amount of underpayment on the life insurance totaled $25,021.65.

In early 2002, Lorinsky recommended to Viejas that it switch its life insurance from The Hartford to Unum Life Insurance, on the basis of its secured pricing structure that would allow it to maintain the same rates going forward, because he anticipated that The Hartford was going to raise its rates on renewal. As of February 1, 2002, Unum Life Insurance was insuring both the tribal members and the casino employees.

## II

## THE HEALTH INSURANCE POLICIES

In addition to the life insurance policies, Lorinsky also was to procure individual and aggregate stop loss health insurance policies from The Hartford for members of the tribe and Viejas' employees.[9] On January 11, 2002, Lorinsky was notified by The Hartford that it was missing aggregate stop loss policy payments for the months of December, 2001, and January, 2002, for the tribe's health insurance. On January 11, 2002, Lorinsky notified Viejas' director of finances that its aggregate stop loss policy could be renewed for an annual premium of $25,000, and Viejas issued a check to The Hartford in the amount of $25,000 that day. On January 14, 2002, The Hartford sent Lorinsky a quote for renewal of the aggregate stop loss policy; the annual premium

---

[9] Lynn Oswianko, an account specialist at The Hartford in 2001 and 2002, testified that "[s]top loss business protects employers against large catastrophic claims . . . . Aggregate stop loss . . . limits the employer's liability in total claims that are generated by eligible employees or their dependents. What happens is . . . an attachment point is calculated to determine what the employer's liability is. If the total number of claims within a policy period exceeds that attachment point, then The Hartford would reimburse the policy holder." Individual stop loss coverage is an insurance policy that protects the client against any one individual incurring claims over a certain threshold.

would be $10,500. The Hartford's quote was significantly lower than the $25,000 premium figure that Lorinsky had quoted to Viejas.

The $25,000 check was received by The Hartford on January 17, 2002, and there was confusion as to where it was to be applied; The Hartford was unclear whether it was meant to be applied to the group life insurance program or the aggregate stop loss or the individual stop loss program.[10] Viejas still owed $21,907.50 resulting from the underpayments on the life insurance policies at that point. Lorinsky testified that the money was intended to be applied to the aggregate stop loss balance. Once The Hartford resolved the internal confusion, the money eventually all was applied to the balance due on the life insurance premiums. Payments were still due on the aggregate stop loss insurance policy because there was a shortage on the premium and the rates had not been paid.[11] Viejas was under the impression that it had an aggregate stop loss insurance policy in place that covered the Viejas employees as well as an individual stop loss policy; however, on the basis of their underpayments, the aggregate stop loss policy was never properly renewed.

On February 27, 2002, The Hartford advised Lorinsky that Viejas had not yet paid its aggregate stop loss premiums or submitted its December monthly accounting. On March 11 and 20, 2002, The Hartford notified Lorinsky by e-mail that Viejas owed $10,734.90 on its aggregate stop loss policy. The March 20 e-mail stated that The Hartford had cancelled the aggregate stop loss policy as of January 1, 2002, but that the policy could be reinstated if a check for $10,734.90 was sent to The Hartford overnight. Lorinsky did not notify Viejas at

---

[10] The Hartford also received a check from Viejas via Lorinsky for $19,461.26 for the January, 2002 premium payment on that date.

[11] The policy of The Hartford is to cancel an insurance policy thirty days after the nonpayment or improper payment of premiums.

that time that the aggregate stop loss policy premium was still due. On March 20, 2002, The Hartford received a check from Viejas in the amount of $81,840.29.[12] After applying this payment, a balance of $10,500 remained on the January, 2002 aggregate stop loss premium and $234.90 remained for the monthly accounting fee that had been due on December 1, 2001.

On July 30, 2002, Viejas received notice that its aggregate stop loss policy had been cancelled effective January 1, 2002, due to nonpayment and that for the policy to be reinstated, The Hartford required $10,734.90 to be sent via overnight delivery. Lorinsky's services were terminated as the broker of record on August 7, 2002. Viejas retained Marsh Risk & Insurance Service (Marsh) as its replacement broker, and Marsh was able to reinstate Viejas' aggregate stop loss coverage but at significantly higher rates. In addition, because the policy had lapsed, Viejas had to pay claims out of its funds that it would not have had to pay had the policy been in place. Furthermore, Lorinsky never procured aggregate stop loss insurance for Viejas' employees, although Viejas had been under the impression that such a policy was in place.

Viejas filed an eight count complaint, naming both Lorinsky and First Nations as defendants, on January 23, 2006. The complaint alleged breach of fiduciary duty, negligence, negligent misrepresentation, fraud and violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., against Lorinsky and First Nations; breach of contract and breach of the implied covenant of good faith and fair dealing against First Nations only; and breach of an implied contract against Lorinsky only. The defendants

[12] The check was applied as follows: $11,691.47 to the balance due on the individual stop loss policy, $35,074.41 to the February, 2002 individual stop loss premium and $35,074.41 to the March individual stop loss premium. None of the money was applied to the aggregate stop loss premium.

filed an answer on March 27, 2006, and a motion to dismiss on June 25, 2007, which was denied on July 7, 2007. Trial began on July 10, 2007, and ended on July 18, 2007. On July 25, 2007, the jury returned a verdict in favor of Viejas on all counts against Lorinsky but found in favor of First Nations on all counts. The jury found that Viejas sustained $678,239.40 in damages as a result of there being no aggregate stop loss coverage in place from September 1, 2001, through August 31, 2002, and attributed all damages to Lorinsky.[13] The court awarded Viejas $122,194.58 in offer of judgment interest. On December 18, 2007, the court granted Viejas' motion for costs and attorney's fees, awarding $100,000 in attorney's fees and $16,500 in costs, making the total amount of the judgment $916,933.98, and judgment entered on January 31, 2008. This appeal followed. Additional facts will be set forth as necessary.

### III

Lorinsky first claims that the court improperly failed to dismiss the action because the accidental failure of suit statute, § 52-592, does not apply. He argues that § 52-592 does not protect Viejas' claims, and, therefore, the statute of limitations had run on the fraud, breach of fiduciary duty, negligence, negligent misrepresentation and CUTPA claims. We disagree and conclude that the court properly denied the defendants' motion to dismiss.

The following additional facts are relevant to our resolution of Lorinsky's claim. Viejas initially commenced this action by filing a complaint against the defendants in the United States District Court for the District of Connecticut on December 9, 2003. On January 3, 2006, Viejas filed a motion to dismiss its case for

---

[13] The jury also found, however, that Viejas sustained no damages when its aggregate stop loss coverage was cancelled and no damages when it paid for the surgery of an employee who was not covered.

lack of diversity jurisdiction pursuant to rule 41 (a) (2) of the Federal Rules of Civil Procedure after learning that for the purposes of diversity jurisdiction, Indian tribes are not citizens of the state in which they reside, nor are they foreign states. The motion was granted without prejudice by the federal court on January 6, 2006. The action then was refiled in Superior Court in the judicial district of New London on January 23, 2006.

The defendants filed a motion to dismiss on June 25, 2007, requesting that the court dismiss Viejas' action because at all times prior to the filing of the initial action, Viejas knew that the federal court did not have jurisdiction and because Viejas' voluntary act in dismissing its action did not provide it with the benefit of the accidental failure of suit statute.[14] After a hearing, the court denied the motion on July 7, 2007, and the case proceeded to trial the following week.

We first set forth the applicable standard of review. "A motion to dismiss . . . properly attacks the jurisdiction of the court, essentially asserting that the plaintiff cannot as a matter of law and fact state a cause of action that should be heard by the court. . . . A motion to dismiss tests, inter alia, whether, on the face of the record, the court is without jurisdiction. . . . [O]ur review of the trial court's ultimate legal conclusion and resulting [decision to deny] . . . the motion to dismiss will be de novo." (Internal quotation marks omitted.) *Housing Authority* v. *DeRoche*, 112 Conn. App. 355, 362, 962 A.2d 904 (2009). "When a . . . court decides

---

[14] We note that this court has recently reiterated that "although a motion to dismiss may not be the appropriate procedural vehicle for asserting that an action is not saved by . . . § 52-592, our Supreme Court has held that a court properly may consider a motion to dismiss in such circumstance[s] when the plaintiff does not object to the use of the motion to dismiss." (Internal quotation marks omitted.) *LaBow* v. *LaBow*, 85 Conn. App. 746, 750, 858 A.2d 882 (2004), cert. denied, 273 Conn. 906, 868 A.2d 747 (2005). The proper motion to file would have been a motion for summary judgment; however, because the issue was not raised by the parties, we decline to address it.

a jurisdictional question raised by a pretrial motion to dismiss, it must consider the allegations of the complaint in their most favorable light. . . . In this regard, a court must take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader. . . . The motion to dismiss . . . admits all facts which are well pleaded, invokes the existing record and must be decided upon that alone." (Citation omitted; internal quotation marks omitted.) *Cogswell* v. *American Transit Ins. Co.*, 282 Conn. 505, 516, 923 A.2d 638 (2007).

Section 52-592, the accidental failure of suit statute, provides in relevant part: "(a) If any action, commenced within the time limited by law, has failed one or more times to be tried on its merits because of insufficient service or return of the writ due to unavoidable accident or the default or neglect of the officer to whom it was committed, or because the action has been dismissed for want of jurisdiction, or the action has been otherwise avoided or defeated by the death of a party or for any matter of form; or if, in any such action after a verdict for the plaintiff, the judgment has been set aside, or if a judgment of nonsuit has been rendered or a judgment for the plaintiff reversed, the plaintiff, or, if the plaintiff is dead and the action by law survives, his executor or administrator, may commence a new action, except as provided in subsection (b) of this section, for the same cause at any time within one year after the determination of the original action or after the reversal of the judgment. . . . (d) The provisions of this section shall apply to . . . any action brought to the United States circuit or district court for the district of Connecticut which has been dismissed without trial upon its merits or because of lack of jurisdiction in such court. If such action is within the jurisdiction of any state court, the time for bringing the

action to the state court shall commence from the date of dismissal in the United States court, or, if an appeal or writ of error has been taken from the dismissal, from the final determination of the appeal or writ of error."

"Deemed a saving statute, § 52-592 enables plaintiffs to bring anew causes of action despite the expiration of the applicable statute of limitations. . . . In order to fall within the purview of § 52-592, however, the original lawsuit must have failed for one of the reasons enumerated in the statute." (Citation omitted; internal quotation marks omitted.) *Skinner* v. *Doelger*, 99 Conn. App. 540, 553, 915 A.2d 314, cert. denied, 282 Conn. 902, 919 A.2d 1037 (2007). "Although § 52-592 should be broadly construed because of its remedial nature, it should not be construed so broadly as to hamper a trial court's ability to manage its docket by dismissing cases for appropriate transgressions. . . . Nevertheless, looming behind § 52-592 is the overarching policy of the law to bring about a trial on the merits of a dispute whenever possible and to secure for the litigant his day in court." (Internal quotation marks omitted.) *Boone* v. *William W. Backus Hospital*, 102 Conn. App. 305, 313, 925 A.2d 432, cert. denied, 284 Conn. 906, 931 A.2d 261 (2007).

The parties do not dispute that the initial action was filed in federal court within the applicable statute of limitations.[15] Viejas relies on the provision of § 52-592 that permits refiling if an action was dismissed "for want of jurisdiction . . . ." General Statutes § 52-592 (a). Lorinsky asserts that Viejas should have known the law, particularly because Viejas was involved in other federal court cases involving the same issue at the time and should not be permitted to use § 52-592 to its benefit

---

[15] The tort claims are subject to a three year statute of limitations. See General Statutes § 52-577. The CUTPA claim was also subject to a three year statute of limitations. See General Statutes § 42-110g (f).

when it voluntarily moved to dismiss its case in federal court. At the hearing regarding the defendants' motion to dismiss, the court asked the defendants' counsel whether § 52-592 would apply if Viejas had not voluntarily withdrawn the action but instead the federal court had dismissed it sua sponte on the basis of a lack of subject matter jurisdiction.[16] The defendants' counsel argued that because Viejas had the option of choosing the forum in which to file its action, and could have filed in state court initially but elected not to do so, Viejas could not use § 52-592 to circumvent the statute of limitations, regardless of whether it had dismissed its case voluntarily or the court dismissed the case on its own. The court responded, stating, "If that's your opinion, that's ridiculous. . . . The only issue before me when you argued earlier when they voluntarily withdraw, they [deprive] themselves of coming under the statute. You're now claiming [that] if the federal court dismissed this case on its own [and Viejas] never even knew about the problem in federal court, [Viejas could still not take advantage of the accidental failure of suit statute]?"

Viejas maintained at the hearing and in its brief that the accidental failure of suit statute is broad enough to encompass a federal action that was dismissed for lack of jurisdiction either by the court or on Viejas' motion. At the conclusion of the hearing, the court agreed and summed up its position as follows: "I feel the mere technicality that [Viejas] withdrew the action rather than waiting for the federal court to grant the motion to dismiss, which the court had to do because the court must be cognizant of any motion to dismiss, and if there's lack of jurisdiction, [the court] must grant it. I

---

[16] An issue of subject matter jurisdiction may be raised by the court sua sponte at any stage of the proceedings. See *Grimm* v. *Grimm*, 276 Conn. 377, 393 n.18, 886 A.2d 391 (2005), cert. denied, 547 U.S. 1148, 126 S. Ct. 2296, 164 L. Ed. 2d 815 (2006).

think it's a mere technicality, and I think the accidental failure of suit statute does apply in this case, and, therefore, I'll deny the motion."

Lorinsky cites to *Parrott* v. *Meacham*, 161 Conn. 573, 290 A.2d 335 (1971), for the proposition that an action that is voluntarily withdrawn does not fall within the protection of § 52-592. In *Parrott*, the plaintiff filed an action in state court, and three years later a judgment of nonsuit was entered against him for his failure to proceed at trial when ordered to do so. He then asked his attorneys to withdraw the case and six months later instituted a second action in state court, identical to the first, through new counsel "purporting to act under the provisions of . . . § 52-592 . . . ." Id., 574. Lorinsky emphasizes the language of the holding, which states: "The original action having been voluntarily withdrawn by the plaintiff, that withdrawal . . . cannot by the most liberal construction constitute accidental failure of suit for matter of form, and the circumstances do not bring this case within the saving terms of § 52-592." (Internal quotation marks omitted.) Id., 575.

We do not find *Parrott* to be controlling. Lorinsky neglects to acknowledge that the original matter in *Parrott* was withdrawn in an attempt to circumvent the judgment of nonsuit that was entered against the plaintiff and was based on the absence of any accident. Here, the basis of the withdrawal was the lack of subject matter jurisdiction of the federal court, and Viejas' voluntary withdrawal merely preempted the court's having to dismiss the action sua sponte. The action presumably would have been dismissed from federal court for lack of subject matter jurisdiction regardless. In addition, as Viejas points out, *Parrott* was decided under the "matter of form" prong of § 52-592, and not the "want of jurisdiction" prong, for which it is unnecessary to

prove the existence of an accident. See *Parrott* v. *Meacham*, 161 Conn. 575. We agree with the court and are unwilling to draw a distinction between Viejas' moving for a voluntary dismissal and the court's dismissing the case sua sponte.

This court has cited with approval a trial court's statement that "§ 52-592 (d) allows the plaintiff to pursue the state law claims that were dismissed without prejudice in federal court." (Internal quotation marks omitted.) *Daoust* v. *McWilliams*, 49 Conn. App. 715, 721, 716 A.2d 922 (1998). Section 52-592 contains no caveat, and neither this court nor our Supreme Court has attached one, that the statute applies only if such claims were dismissed without prejudice but not on the plaintiff's motion.

We also cannot distinguish the present case from the circumstances in *Southport Manor Convalescent Center, Inc.* v. *Foley*, 216 Conn. 11, 578 A.2d 646 (1990). In *Southport Manor Convalescent Center, Inc.*, the plaintiffs initially commenced their action in the Superior Court for the judicial district of Stamford-Norwalk, and the defendant filed a motion to dismiss, alleging that there was no basis for venue in the Stamford-Norwalk judicial district and that there was a prior action pending between the parties. Id., 12. The trial court granted the defendant's motion to dismiss on jurisdictional grounds after the plaintiff failed to file a timely memorandum of law in opposition to the defendant's motion. Id. After this court concluded that judgment of dismissal for failure to file a timely opposing memorandum amounted to a judgment on the merits that barred relitigation on the basis of res judicata, our Supreme Court disagreed. The court held that the plaintiff's failure to file an opposition brief amounted to no more than a concession that either venue was improper or that a prior action was pending elsewhere and noted that § 52-592 specifically authorizes a plaintiff

to commence a new action if the original action is dismissed for want of jurisdiction. Id., 16.

We will not, therefore, distinguish between a plaintiff who voluntarily dismisses its action because of want of jurisdiction and one whose action is dismissed because it has conceded to the lack of jurisdiction. There also is no concern that the plaintiff repeatedly could withdraw voluntarily its case and continue to refile, thereby extending the statute of limitations indefinitely. See *Rosario* v. *Hasak*, 50 Conn. App. 632, 638–39, 718 A.2d 505 (1998); see also *Baker* v. *Baningoso*, 134 Conn. 382, 387, 58 A.2d 5 (1948).

Lorinsky's claim that § 52-592 should not apply because, irrespective of Viejas' voluntary motion for dismissal, Viejas was or should have been aware that the District Court had no jurisdiction when it instituted the action is without merit. The provision of § 52-592 allowing for refiling for want of jurisdiction is separate and distinct from the provision allowing for refiling for unavoidable accident, making it clear that the dismissal for want of jurisdiction does not need to be the result of a mistake or accident for § 52-592 to apply. "In 1917, the statute was amended. The amendment added erasure for lack of jurisdiction as a distinct, independent and self-sufficient ground which could be used as the basis for commencing a new action. As it appears in the present statute, the clause relating to erasures for lack of jurisdiction is general and comprehensive, and neither embodies nor suggests dependency on or reference to any of the other enumerated grounds. The clauses in the statute which set forth the various grounds for commencing a new action appear in the disjunctive and provide alternate bases for instituting a new suit. . . . It does not follow . . . that accidental failure must be shown under § 52-592 when a party brings a new action under another of the enumerated

grounds." (Citations omitted.) *Broderick* v. *Jackman*, 167 Conn. 96, 98–100, 355 A.2d 234 (1974).

## IV

Lorinsky next claims that the evidence was insufficient to support the jury's award of damages. Specifically, he asserts that the jury's damages award was based on estimates and that Viejas did not prove its damages with sufficient particularity. He claims that, as a result, the court improperly denied the defendants' motion to set aside the verdict. We disagree.

The following initial facts are relevant for our discussion. Lorinsky failed to obtain an aggregate stop loss policy for Viejas' employees from The Hartford or from any other source, while leading Viejas to believe that he had. An aggregate stop loss insurance policy provides coverage if the total amount of claims during a policy period exceeds a certain set figure. Because Viejas was without coverage for its employees from September 1, 2001, through August 31, 2002, it was without a policy that would have covered any claims exceeding the aggregate attachment point set by the policy. Viejas put forth evidence as to the total amount of the monetary damages that it suffered by virtue of being without coverage, and the jury awarded $678,239.40 in damages.

The standard of review applicable to claims of insufficient evidence is as follows: "[I]t is not the function of this court to sit as the seventh juror when we review the sufficiency of the evidence . . . rather, we must determine, in the light most favorable to sustaining the verdict, whether the totality of the evidence, including reasonable inferences therefrom, supports the jury's verdict . . . . In making this determination, [t]he evidence must be given the most favorable construction in support of the verdict of which it is reasonably capable. . . . In other words, [i]f the jury could reasonably have reached its conclusion, the verdict must stand,

even if this court disagrees with it." (Internal quotation marks omitted.) *Mann* v. *Regan*, 108 Conn. App. 566, 579, 948 A.2d 1075 (2008).

"It is axiomatic that the burden of proving damages is on the party claiming them. . . . When damages are claimed they are an essential element of the plaintiff's proof and must be proved with reasonable certainty. . . . Damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty. . . . Although damages often are not susceptible of exact pecuniary computation and must be left largely to the sound judgment of the trier . . . this situation does not invalidate a damage award as long as the evidence afforded a basis for a reasonable estimate by the [trier] of that amount. . . . The determination of damages involves a question of fact that will not be overturned unless it is clearly erroneous." (Internal quotation marks omitted.) *Allstate Ins. Co.* v. *Palumbo*, 109 Conn. App. 731, 742, 952 A.2d 1235 (2008).

"Speculative evidence is not sufficient evidence for the trier to make a fair and reasonable estimate of the plaintiff's damages"; *CAS Construction Co.* v. *East Hartford*, 82 Conn. App. 543, 557, 845 A.2d 466 (2004); however, "[m]athematical exactitude in the proof of damages is often impossible, but the plaintiff must nevertheless provide sufficient evidence for the trier to make a fair and reasonable estimate." (Internal quotation marks omitted.) *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 59, 717 A.2d 77 (1998). Evidence is considered speculative when there is no documentation or detail in support of it and when the party relies on subjective opinion. See *CAS Construction Co.* v. *East Hartford*, supra, 557.

We conclude that there is sufficient evidence in the record to support the jury's award of damages in the

amount of $678,239.40 resulting from Lorinsky's failure to procure aggregate stop loss coverage for Viejas' employees. Lorinsky contends that the evidence was insufficient because Viejas established only an estimate of what the gross claims would be, and this estimate was not a sufficient foundation on which to base an award of damages. This contention is without merit.

Viejas introduced the relevant evidence in three distinct segments. The evidence of the amount of damages from September, 2001, through May, 2002, was presented to the jury in the form of a chart that had been faxed from Lorinsky to Viejas. The evidence of the amount of the July, 2002 claims was presented in the form of an e-mail sent from the president of Plan Handlers, Inc.; see footnote 4; to Lorinsky, and Eric Hans, the director of treasury for Viejas, testified as to an estimate of the claims for June and August, 2002.

Viejas introduced into evidence an exhibit, a fax sent from Lorinsky to Jeffrey Warner, one of the finance officers at Viejas, which set out the total amount of aggregate claims for the months of September, 2001, through May, 2002. All of the numbers were between $450,000 and $500,000. The chart also set out the total number of employees covered by the plan in each month. Warner testified that the numbers presented in this chart were not estimates but, instead, were "the actual cost" and the dollar amounts of the claims for the months listed. Qua Lynn Gavin, a former human resources employee of Viejas, also testified that these numbers represented "the amount of claims that were paid that month."

Lorinsky disputed that these numbers were accurate and testified that the chart "appears to be an example of approximation of what the claims might have been." He testified that he could not say that the numbers were accurate because each was "just a number without

any backup to verify what it really stands for." He also attempted to undercut the validity of the figures by testifying: "We don't know if the numbers for participants match up, we don't know if this has been audited claims, we don't know any information about it whatsoever, how accurate it is. We also don't show any reimbursements being made on the individual stop loss that might have been deducted from that number. . . . I mean, I never could represent the gross amount of money that was paid out. That could include—it doesn't tell us whether it included the money they were paying to the plan for the insurance, for all these other expenses. It doesn't talk about whether or not there's been any reimbursements taken out of it. So, you don't really know for sure other than the fact that that may be the total dollars that they spent, but did that include the insurance premiums? It probably did. Administrative expenses? It probably did. All those would not be included when you're calculating whether or not it went over the attachment factor."

As further support, Viejas also introduced into evidence, without objection, an exhibit dated May 24, 2002, a printout by Plan Handlers, Inc., titled "Individual Payment Report," which listed the total amount of claims paid for the policy year as of that date—$4,279,326.94. Warner testified that this document showed the total aggregate amount paid as of May 24, 2002.

Viejas also introduced evidence regarding the amount of claims for June, July and August, 2002. The amount of the July, 2002 claims was presented in the form of an e-mail sent from Denyce Cooper, the president of Plan Handlers, Inc., to Lorinsky, and a Viejas employee testified about his knowledge of the June and August, 2002 claims. The e-mail, dated July 25, 2002, provided that the total amount of claims paid for July, 2002, was $514,603.97 and estimated that the August, 2002 claims would be less than $400,000.

Regarding the June, 2002 claims, Hans, the director of treasury for Viejas, was asked if he could provide "a reasonable and probable estimate as to what the claims activity was for June, 2002." Hans testified: "Well, the estimate that I derived for the actual claims activity for that month would have been taking the average of the claims activity that's reported in this document of $4.2 million, dividing that by the number of months that had occurred to get our average monthly claims, and then applying that number as an estimate of what the claims possibly would have been."[17] Hans obtained the monthly average by dividing $4,279,326.94 by nine, the number of months in the policy year as of the date that figure was calculated, and estimated that the total amount of claims for June, 2002, would have been $475,480.[18]

When asked if that number would also be a reasonable and probable estimate for the August, 2002 claims as well, Hans noted that to calculate the amount for August, 2002, it would be more accurate to take the actual number of total claims through May, 2002, and the actual number of claims for July, 2002, add those two numbers together and take the average of that number. Hans calculated the August, 2002 claims to be $479,307 and calculated the total amount of claims from September, 2001, through August, 2002, to be $5,748,446.

Having thoroughly reviewed the record, we cannot conclude that the jury's damages award was clearly erroneous. Viejas' evidence regarding some of the months' claims, while perhaps not calculated with the

---

[17] The document to which Hans was referring was the individual payment report from Plan Handlers, Inc.; see footnote 4; dated May 24, 2002, noted previously.

[18] The defendants' attorney objected to the introduction of this figure. He stated: "I'm going to object at this point to him using estimations and reasonable probable[s] based on averages." The court overruled the objection.

most precise mathematical exactitude, was certainly a reasonable estimate. The jury accepted these figures, and Lorinsky was given the opportunity to diminish the jury's reliance on them through his testimony. We emphasize that a reasonable estimate can be sufficient to support a damages award if the record supports it and that "Connecticut law does not require a party claiming damages to prove them with exactitude or precision." *Schoonmaker* v. *Lawrence Brunoli, Inc.,* 265 Conn. 210, 241, 828 A.2d 64 (2003). Accordingly, Lorinsky's claim must fail.

V

Lorinsky's third claim is that the court improperly denied the defendants' motion for a mistrial after the jury returned an inconsistent plaintiff's verdict form. He asserts that because the initial verdict form was internally inconsistent, the verdict was manifestly unjust, and the court should have declared a mistrial. He also claims that the court improperly denied the defendants' motion to set aside the verdict because the jury's verdict improperly relied on estimates when awarding damages. We are not persuaded.

The following facts are relevant to Lorinsky's claim. When the plaintiff's verdict form was returned, the jury found Lorinsky liable for breach of fiduciary duty, negligence, negligent misrepresentation, fraud and a CUTPA violation. The jury found that First Nations was not liable for breach of fiduciary duty, negligence, negligent misrepresentation, fraud and a CUTPA violation but found that First Nations was liable for breach of contract and breach of the implied covenant of good faith and fair dealing. The jury found that Viejas had sustained $678,239.40 in damages as a result of the lack of aggregate stop loss coverage for the period of Sep-

tember 1, 2001, through August 31, 2002, and attributed all of the damages to Lorinsky.[19]

The court immediately excused the jury and stated that the jury's finding that First Nations breached the contract and breached the covenant of good faith and fair dealing but awarding no damages against First Nations appeared to be inconsistent. The court proposed to send the jury to deliberate again with the instruction that it should reconsider the verdict and either find First Nations not liable and attribute no damages to it or find First Nations liable and assess damages against it. Viejas' attorney agreed with the proposed solution, but the defendants' attorney requested a mistrial, which the court denied. After a chambers conference, the court summoned the jury and stated: "Ladies and gentlemen, your verdict indicates that you found [that] First Nations breached the contract with [Viejas] and also breached an implied covenant of good faith and fair dealing, but you found no damages against First Nations for such breach. Your verdict appears to be inconsistent, and I will send you back to reconsider it. If, after you reconsider the verdict, you feel that you want to stand by the verdict, all you'll have to do is come back here and render your verdict as you did before. If, on the other hand, after talking the matter over, you think some changes ought to be made in the verdict, you may revise your verdict accordingly."

The jury was excused for further deliberation,[20] and the next day the jury returned a verdict that found

[19] The jury also found that Viejas sustained no damages as a result of having to pay for a certain employee's surgery that was not covered by the health care plan and found that neither Lorinsky nor First Nations wrongfully detained money owing to Viejas.

[20] The defendants' counsel asked the court to recharge the jury during this time and also filed a motion requesting new jury instructions pursuant to General Statutes § 52-223, but the court denied the request and the motion.

Lorinsky liable on the same counts as the first verdict and found First Nations not liable on all counts. The verdict again assessed all $678,239.40 of damages against Lorinsky. The court accepted and recorded the revised verdict.

Lorinsky argues that the jury's actions in attributing damages to him while finding that First Nations was not liable for breach of contract or breach of the covenant of good faith and fair dealing is inconsistent because he was an employee of First Nations and, therefore, could not breach any contract that was between First Nations and Viejas, and the jury was required to attribute damages to First Nations if it found that Viejas had been damaged. Lorinsky asserts that the jury found against him on the counts of breach of contract and breach of the duty of good faith and fair dealing, but Viejas' complaint and the verdict form clearly indicate that Viejas did not bring those counts against Lorinsky.

We first consider whether the court improperly refused to grant the defendants' motion for a mistrial. "The standard by which we review a court's ruling on . . . a motion for a mistrial is abuse of discretion. . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Internal quotation marks omitted.) *New Haven* v. *Tuchmann*, 93 Conn. App. 787, 791, 890 A.2d 664, cert. denied, 278 Conn. 903, 896 A.2d 104 (2006). "It is within the trial court's discretion to determine whether the opportunity for a fair trial is sufficiently remote that a mistrial should be granted." *Bansak* v. *Pawelczyk*, 173 Conn. 520, 522, 378 A.2d 569 (1977). A factually inconsistent verdict may be indicative of negotiation or compromise among the members of the jury and will not be overturned on appeal. See *State* v. *Spyke*, 68

Conn. App. 97,118, 792 A.2d 93, cert. denied, 261 Conn. 909, 804 A.2d 214 (2002).

The essence of Lorinsky's claim is that the jury could not have assessed damages against him without also assessing damages against First Nations because Lorinsky was not a party to the contract to provide insurance brokerage services between Viejas and First Nations. This contention is wholly without merit. The damages were assessed against Lorinsky "because there was no aggregate stop loss coverage for [Viejas' employees] for the period of September 1, 2001, through August 31, 2002." The damages were not explicitly, in whole or in part, attributable to any breach of contract on either defendant's part. The jury found Lorinsky liable for breach of fiduciary duty, negligence, negligent misrepresentation, fraud, and a violation of CUTPA, and could have attributed the damages to Lorinsky on any one of those theories or on a combination of all of them. The jury's verdict was not inconsistent, no manifest injustice resulted from it and the court did not abuse its discretion in denying the defendants' motion for a mistrial.

We also reject Lorinsky's claim that the court improperly refused to set aside the verdict. We set forth the well settled standard of review for such claims. "The trial court possesses inherent power to set aside a jury verdict which, in the court's opinion, is against the law or the evidence. . . . [The trial court] should not set aside a verdict where it is apparent that there was some evidence upon which the jury might reasonably reach their conclusion, and should not refuse to set it aside where the manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles . . . . Ultimately, [t]he decision to set aside a verdict entails the exercise of a broad legal discretion . . . that, in the absence of clear abuse, we shall not disturb."

(Internal quotation marks omitted.) *Monti* v. *Wenkert*, 287 Conn. 101, 110–11, 947 A.2d 261 (2008).

"We do not . . . determine whether a conclusion different from the one reached could have been reached. . . . [A] motion to set aside the verdict should be granted if the jury reasonably and legally could not have reached the determination that [it] did in fact reach. . . . If the jury, without conjecture, could not have found a required element of the cause of action, it cannot withstand a motion to set aside the verdict." (Citation omitted; internal quotation marks omitted.) *Macchietto* v. *Keggi*, 103 Conn. App. 769, 773, 930 A.2d 817, cert. denied, 284 Conn. 934, 935 A.2d 151 (2007). For the reasons set forth previously, the jury did not misapply the pertinent legal principles and reasonably concluded that Viejas' damages were $678,239.40 and were attributable to Lorinsky.

The judgment is affirmed.

In this opinion the other judges concurred.