ERIK M. PIN ET AL. *v.* DAVID L. KRAMER ET AL.
(AC 29314)

Bishop, Lavine and Schaller, Js.

34

Argued September 8, 2009—officially released January 19, 2010

*Lawrence F. Reilly*, for the appellants (plaintiffs).

*Daniel E. Ryan III*, for the appellees (defendants).

*Opinion*

BISHOP, J. The plaintiffs, Erik M. Pin, a minor, and his mother, Carrie L. Pin,[1] appeal from the judgment in favor of the defendants, David L. Kramer, an orthopedic surgeon, and Danbury Orthopedic Associates, P.C., following a jury trial on their medical malpractice claim. On appeal, the plaintiffs claim that the court improperly (1) restricted their questioning of potential jurors during voir dire, (2) assumed the role of an advocate and interfered with the presentation of their case, examination of witnesses and cross-examination of the defendants' expert witness, (3) refused to admit Kramer's deposition testimony into evidence, (4) prevented them from offering rebuttal testimony regarding the defendants' learned treatises, as well as interfered with their cross-examination by improperly finding that they lacked foundation for questions regarding the learned treatises, (5) applied the learned treatise doctrine to admit inadmissible hearsay and (6) denied their motion for a mistrial or for a curative instruction after hearing improper and harmful testimony from the defendants' medical expert. We agree that the court abused its discretion by denying the plaintiffs' request for a curative instruction following the testimony from the defendants' medical expert and thereby prevented the plaintiffs from receiving a fair trial. Accordingly, we reverse the judgment of the trial court and remand the case for a new trial.[2]

The jury reasonably could have found the following facts. In 2001, when he was ten years old, the plaintiff

---

[1] Carrie L. Pin brought this action as a parent and next friend of her minor son. She also brought the action on her own behalf for damages arising from her son's injuries.

Erik M. Pin is referred to in this opinion individually as the plaintiff, and Erik M. Pin and his mother, Carrie L. Pin, are referred to collectively in this opinion as the plaintiffs.

[2] Because we reverse on the basis of the plaintiffs' sixth claim, we do not, and need not, reach claims one through five, as we do not believe they are issues that are likely to arise again in a retrial of this case.

was given a scoliosis examination at school, which revealed an abnormality in his back. His pediatrician, Jay D'Orso, referred him for X rays and a computerized tomography (CT) scan of his spine, which revealed that a 2.5 centimeter bony mass "exhibit[ing] the features of an osteochondroma" was growing out of the plaintiff's spine.[3] Prior to this discovery, the plaintiffs had no knowledge of this mass, nor had the plaintiff exhibited any symptoms related to it. D'Orso next referred the plaintiff to Danbury Orthopedic Associates, P.C., where he was examined by Kramer. During the plaintiff's first visit with Kramer in April, 2001, Kramer physically examined the plaintiff and reviewed reports of the X rays and CT scan that previously had been taken. Kramer confirmed that the mass was an osteochondroma but recommended to the plaintiffs that they take a conservative approach. He did not recommend immediate removal of the mass but told the plaintiffs that they would need to keep an eye on it because lesions of this nature have a "propensity toward increasing in size during periods of active growth."[4] Kramer informed the plaintiffs that if the lesion increased in size or became symptomatic, they should then consider having it removed. After the visit, Kramer reviewed the actual films from the X rays and CT scan to verify the findings in the radiologist's report.

At his next visit, eight months later, the plaintiff informed Kramer that the mass was "somewhat irritating . . . especially upon lying down or when pressing his back against a wall" and that he had decided that he wanted the tumor removed. Kramer explained the steps involved in such a surgery and informed the plaintiffs of the risk of infection and of regrowth of the mass.

---

[3] The plaintiffs' brief describes an osteochondroma as a benign bone tumor, which consists of a bony protrusion covered by a cartilage cap.

[4] Throughout the record, the plaintiff's osteochondroma is interchangeably referred to as a "lesion," a "tumor" and a "mass."

Kramer scheduled the surgery for December 28, 2001. Prior to the surgery Kramer did not order updated X rays, a CT scan or a magnetic resonance imaging (MRI) scan.[5] Kramer's plan was to remove the lesion by using a technique called a marginal resection. This method contemplates cutting the lesion off at its base, where it is growing from the good bone, and removing it in one piece.

During the surgery, Kramer was able to cut the lesion away from the spine in one piece, using a chisel, but was unable to extract the tumor. Kramer testified that the tumor appeared to be caught up on some portion of the plaintiff's anatomy. The operative report revealed that the "mass had extended between the T5 and T6 transverse processes and ribs," and it was protruding inward toward the plaintiff's lungs. Kramer decided to break the tumor into pieces so that he could remove the entire mass.[6] The parties disagree over the method used to break apart the tumor. Although the postoperative report stated that Kramer used curets to break the tumor into fragments, he testified, at trial, that he used an osteotome to break the tumor in half, take out half of it, break it in half again and take out the other two pieces.

After the surgery, the plaintiff stayed in the hospital overnight. Kramer saw him on two occasions after the surgery. He examined the plaintiff's wound to look for infection but did nothing further. He did not order any

---

[5] The defendants contended at trial that it was unnecessary to take a CT scan because a physical examination showed that the lesion had not changed and the original X ray showed that the lesion was slow growing. Additionally, an MRI scan was not necessary because the plaintiff did not show signs of neurological symptoms.

[6] The defendants argue that the tumor was cut twice, making three pieces, which were each carefully removed. The plaintiffs claim, however, that Kramer broke the tumor into a large number of small pieces. Medical records do not reveal the number of pieces removed, only that the mass was "broken down into fragments that could be retrieved through the incision."

X rays or monitor the plaintiff to see if the tumor had regrown. Kramer testified that he was satisfied that he had removed the entire tumor and that the recurrence rate was extremely small. At trial, the defendants' medical expert, orthopedic surgeon Todd Albert, testified that Kramer had complied with the standard of care before, during and after the operation.

In June, 2002, about three months after his last visit with Kramer, the plaintiff went to see his primary care physician, D'Orso, about an asymmetry in his ribs. D'Orso ordered X rays, which revealed that the tumor had regrown. The radiologist determined that the tumor was regrowing in the area of the earlier mass. The tumor was growing inward toward the plaintiff's chest cavity and may have encroached into an opening in the spine called a neural foramen.[7] Kramer saw the plaintiff again on July 8, 2002, to evaluate the tumor and decided to refer the plaintiffs to a tumor specialist, Dempsey S. Springfield. Springfield believed that the tumor would continue to grow and thus should be removed. He recommended to the plaintiffs that they watch the growth pattern of the tumor and do another CT scan in September. The September CT scan showed that the tumor had, in fact, continued to grow, and the plaintiffs scheduled surgery for September 19, 2002.

Springfield performed a block excision, which required the entire tumor and the surrounding area, including sections of bone from the ribs and vertebrae, to be removed in one piece.[8] He did not recommend

---

[7] A neural foramen is described by the plaintiffs as a tunnel in the spine leading to the spinal canal. During his deposition, Albert responded affirmatively when asked if the tumor had begun to encroach into the plaintiff's neural foramen, but at trial he testified that the tumor was near, but not in, the neural foramen.

[8] Springfield also refers to the procedure as an en bloc resection, which incorporates a laminectomy, partial rib resections and excision of the lateral portion of the vertebral body.

doing another piecemeal extraction, as that was likely to result in another recurrence of the tumor. Due to the need to remove the entire mass in one piece, the surgery required the removal of portions of healthy bone that were attached to the tumor. As a result of the loss of bone, the plaintiff also underwent a bone graft that was done during the surgery to fuse the spine. This bone graft was unsuccessful and on June 25, 2003, Springfield conducted a second surgery to insert metal rods into the plaintiff's back to align and prevent curvature of the spine. As a result of the surgeries, the plaintiff was required to wear a hard body brace, which made it difficult to walk. In addition to incurring high medical costs, the plaintiff was unable to attend school for one year, requiring that he be taught at home by a private tutor. His academic performance declined greatly, he was unable to participate in sports or dance, and he suffered from depression.

Thereafter, the plaintiffs filed this medical malpractice action against the defendants, alleging that Kramer was negligent in his presurgical care, in the method he used to remove the initial tumor and in his failure to properly follow the plaintiff's progress after the surgery had been completed and that his negligence was the proximate cause of the tumor's regrowth. On August 23, 2007, the jury returned a verdict in favor of the defendants. The plaintiffs' motion to set aside the verdict was denied, and this appeal followed. Additional facts will be set forth as necessary.

The plaintiffs claim that the court improperly denied their motion for a mistrial, or in the alternative, for a curative instruction, after the defendants' witness, Albert, testified that the proliferation of medical malpractice claims has caused the cost of health care to increase and has caused some physicians to leave the practice. We agree.

The following additional facts are relevant to the plaintiffs' claim. The subject testimony occurred on the eighth day of trial during the defendants' direct examination of Albert. After testifying that, in this case, the standard of care did not require additional radiology tests, Albert explained why he would have ordered such tests had he been the treating physician.[9] When asked why he would have ordered the radiology tests, Albert explained:

"Well, a few reasons. One, I am with residents, fellows, and medical students all the time. So, we are ordering a lot of tests on everything so they have the opportunity to read them. And you could say, oh, that's wasteful, but that is part of being at a teaching institution. One. It is for teaching purposes as much as anything, for they have one more chance to look at just one more—they have another dot in their exposure.

"The second reason is much different than in this part of the country and this state. I live in the worst malpractice community in the world. And people—and we practice a lot of defensive medicine. It's true. It's unfortunate, but it's true. And so we order way more tests. You hear about the cost of medicine going up. We are the epicenter of it because we have more doctors leaving because they can't get insurance and things like that. So, we order way more tests than are necessary to protect ourselves. And that's just a fact. And so we get acclimated to practicing like that. So, there's lots of reasons."

At this point, the plaintiffs' counsel asked the court to excuse the jury. With the jury excused, the plaintiffs'

---

[9] Albert testified that he is a professor of orthopedic surgery and the chairman of the department of orthopedics at Thomas Jefferson University in Philadelphia, Pennsylvania. He is also the president of the Rothman Institute, which is one of the departments of orthopedic surgery. Albert testified that he was responsible for 75 to 100 orthopedic surgeons.

counsel explained that he thought the witness had injected improper issues into the case that were extremely prejudicial to the plaintiffs. The plaintiffs requested a mistrial, or in the alternative, an instruction to Albert not to refer to "things like that again," as well as a curative instruction to the jury. The defendants disagreed with the plaintiffs' position, arguing that the comments did not rise to a level that would necessitate a mistrial. The defendants argued that Albert should be permitted to explain why he would have ordered the tests, even while testifying that it was not required by the standard of care. The defendants' counsel also noted that he had not invited the answer by his question, expecting only that Albert would explain how he worked at a teaching hospital and thus would do more than was required to provide learning opportunities for the students. The defendants' counsel concluded by saying that although he did not think that the comments rose to the level warranting a mistrial, if the court wanted to instruct the jury to ignore what Albert had said, he would not object.

In response, as the court was stating that just because the word "insurance" is used, that does not necessarily mean that there are grounds for a mistrial, the defendants' counsel interjected to argue that the use of the word "insurance" was prejudicial to the defendants. The court went on to explain how the "insurance word" is not used in trial because it is prejudicial to "the one person in the room who is vulnerable to that suggestion," meaning the defendants. The court stated that in the context of the entire statement, the court did not find the comment to be prejudicial and that, if anything, it affected the defendants, not the plaintiffs.[10] The court

[10] The court stated: "And, moreover, it is the elephant in the room. I mean, everybody knows that professionals do carry, you know, responsible professionals carry some form of errors and omissions or malpractice. That's just reality. So, if anything, if anything, it affects Dr. Kramer and not your client."

also surmised that the comment would have, in all likelihood, come out during cross-examination because the plaintiffs were certainly going to press the witness as to why he testified that the radiology tests were not required by the standard of care, even though he testified that he would have ordered them. The court also was concerned that if it were to give a curative instruction, it risked "further poisoning of the well toward the defendants." The court concluded, "[s]o you know, my inclination is to leave it alone. For the reasons I have articulated." Accordingly, the court did not issue a curative instruction. As to the motion for a mistrial, the court denied the motion, concluding that there was no prejudice toward the plaintiffs, and, considering the length and expense of the trial, it would be unjust to grant the motion for a mistrial. The plaintiffs later clarified for the record that their objection was not only to the use of the word insurance, but to the entire statement regarding medical malpractice litigation and rising medical costs.

"[T]he principles that govern our review of a trial court's ruling on a motion for a mistrial are well established. Appellate review of a trial court's decision granting or denying a motion for a [mistrial] must take into account the trial judge's superior opportunity to assess the proceedings over which he or she has personally presided. . . . Thus, [a] motion for a [mistrial] is addressed to the sound discretion of the trial court and is not to be granted except on substantial grounds." (Internal quotation marks omitted.) *State* v. *Nash*, 278 Conn. 620, 657, 899 A.2d 1 (2006). In our review of the denial of a motion for a mistrial, we have recognized that "[t]he trial court has wide discretion in ruling on motions for mistrial." *Shelnitz* v. *Greenberg*, 200 Conn. 58, 80, 509 A.2d 1023 (1986). The decision of the trial court is, therefore, reversible on appeal only if there has been an abuse of discretion. *Viejas Band of Kumeyaay*

*Indians* v. *Lorinsky,* 116 Conn. App. 144, 169, 976 A.2d 723 (2009). "In general, abuse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors." (Internal quotation marks omitted.) *State* v. *Nash,* supra, 658. "If there was such an abuse of discretion, the reviewing court then must determine whether the defendant has established that, in light of the totality of evidence at trial and the trial court's subsequent instructions to the jury, the impropriety constituted harmful error." *State* v. *Davis,* 286 Conn. 17, 54, 942 A.2d 373 (2008).

Even though the granting of a mistrial is sometimes required, it is not preferable. "[A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial and [the] whole proceedings are vitiated." (Internal quotation marks omitted.) *Hirsh* v. *Squillante,* 17 Conn. App. 354, 357, 552 A.2d 1222 (1989). "If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided." (Internal quotation marks omitted.) *State* v. *Day,* 233 Conn. 813, 836, 661 A.2d 539 (1995). Indeed, the courts "have always given great weight to [curative] instructions in assessing claimed errors." (Internal quotation marks omitted.) Id., 841; see also *Shelnitz* v. *Greenberg,* supra, 200 Conn. 80.

During his testimony, Albert introduced highly prejudicial issues into the case. Albert explained that he would have done more radiology tests on the plaintiff due to his concern about malpractice claims. He noted that there is a need to practice "defensive medicine" in order to protect against malpractice litigation and discussed how this trend is leading to the increased cost of medicine and is forcing physicians to leave the profession. The unspoken inference to be drawn from

this testimony was that the only reason Kramer would have needed to do additional radiology tests on the plaintiff would be to protect himself against the very litigation that he was then experiencing. After hearing this testimony, it would be difficult to imagine that the jury could or would have ignored its logical implications when considering whether the defendants should be held liable. In addressing the plaintiffs' claim, we are cognizant that the trial court is often better positioned to determine whether a particular section of testimony was prejudicial and that the court's determination of whether or not to grant a remedy for any such prejudice should be given great deference. We cannot, however, defer to the court's decision not to act in this case.

The court's initial concern over the mention of insurance was proper, but this was not the primary issue with which the court was presented. We agree that the general prohibition against mentioning insurance coverage is to protect defendants. The rationale is that if a jury thinks the defendant is insured and that any damages it chooses to award will be paid by the insurance company rather than by the defendant, then the jury will be more likely to find in favor of the plaintiff. In this case, the court was not presented with evidence that the defendants had insurance coverage, but, rather, the topic arose in the context of discussing the difficulties that physicians face in the current legal climate.

In this instance, the plaintiffs, not the defendants, objected to Albert's comments, and, when responding to the plaintiffs' claim of prejudice, the defendants initially did not suggest that they might have been prejudiced in some way. It was not until a moment later when the court mentioned that not every instance where the word "insurance" is mentioned merits a mistrial, that the defendants' counsel made a comment alleging that the defendants were prejudiced by the witness' statement. Although the word "insurance" was used, it arose

in a context helpful, not harmful, to the defendants. This testimony painted a picture sympathetic to physicians, portraying them as constantly forced to defend against malpractice claims and to bear the exorbitant cost of insurance. Whether or not the comment has merit in public discourse, it had no place in this trial.

In reaching its decision not to grant a mistrial or to give a curative instruction to the jury, the court stated that it took into account the status of the trial and the prejudice that might be caused to the defendants by allowing the testimony to stand or by highlighting the testimony with a curative instruction. Eight days into the trial, the court would have needed a compelling reason to declare a mistrial. If, in denying the motion for a mistrial, the court had nevertheless given the jury a curative instruction in an effort to mitigate the damage likely caused by Albert's testimony, the plaintiffs would be in a different position on appeal. Instead, the court denied the plaintiffs' unopposed request that it give a curative instruction and simply told the witness not to mention the insurance again. Because the court did not take any action, this testimony went to the jury as evidence for its consideration during deliberation. The thrust of this expert testimony was highly prejudicial to the plaintiffs because it drew the jury's attention to the claimed economic and professional practice hardships faced by medical practitioners due to claims made against them.

Upon review, we conclude that the court's failure to issue a curative instruction in the face of Albert's inflammatory and prejudicial testimony was an abuse of discretion that likely influenced the jury's deliberations. Although the improper statements by Albert were not pervasive, they introduced a highly controversial and legally improper issue into the case. We conclude that based on the likelihood of prejudice, due to the nature of Albert's comments, and the court's refusal to provide

the jury with an appropriate curative instruction, the plaintiffs were harmed. Accordingly, the plaintiffs were deprived of their right to a fair trial.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.